Donald R. POLING, Junior R. McWilliams, James Thomas Turner, Ralph E. Bunner and Jack McLaughlin, Plaintiffs,

v.

The BALTIMORE & OHIO RAILROAD COMPANY, a corporation, System Federation No. 30 of the Railway Employes' Department of the American Federation of Labor, and others, Defendants.

Nos. 207-E, 208-E, 211-E, 212-E and 213-E.

United States District Court
N. D. West Virginia,
Elkins Division.

Sept. 29, 1958.

Kenneth E. Spencer, Atty., Dept. of Justice, Washington, D. C., and Roderick A. Devison, Asst. U. S. Atty., Fairmont, W. Va., for plaintiffs.

Sydney R. Prince, Baltimore, Md., and Charles W. Yeager, of Steptoe & Johnson, Charleston, W. Va., for defendant Baltimore & O. R. Co.

Richard R. Lyman, of Mulholland, Robie & Hickey, Toledo, Ohio, and William G. Stathers, of Stathers & Cantrall, Clarksburg, W. Va., for all other defendants.

BOREMAN, Judge.

These consolidated cases arise out of claims of employees, returning from military service, to positions and seniority. The actions were first brought in the U. S. District Court, District of New Jersey, in May of 1950, but were transferred to this court for the convenience of the par-

ties and witnesses by order dated June 26, 1950. The proceedings were delayed from time to time over a period of years, apparently without serious objection. System Federation No. 30 of the Railway Employes' Department of the American Federation of Labor, acting in its own behalf and in behalf of all employees of the defendant railroad company who are members of the crafts of employees known as machinists, boiler makers, blacksmiths, sheet metal workers, electrical workers and car men, and approximately twenty-nine named individuals, were permitted to intervene as parties defendant. These intervening defendants filed answers and have actively and consistently contended against the asserted claims of the plaintiffs.

Shortly after entering upon my duties as Judge of this court in 1954, I urged counsel to speed these proceedings but progress has been slow with no apparent desire of either side to hasten the determination of the rights of the parties. Originally there were seven of these actions (each involving the claim of an individual plaintiff), of which four remain for disposition, the other three having been voluntarily dismissed. Following numerous hearings of various motions and objections, the taking of depositions, the taking of testimony before the Court, the presentations of arguments, the filing of briefs and following additional oral arguments, the Court was requested to withhold further consideration pending the decision of the Supreme Court of the United States in the case of McKinney v. Missouri-Kansas-Texas Railroad Company, 357 U.S. 265, 78 S.Ct. 1222, 2 L. Ed.2d 1305. The opinion in that case, written by Mr. Justice Frankfurter, was handed down on June 23, 1958, and counsel here were given the further opportunity to present their views as to the application of that decision to the instant consolidated cases. It appears proper to make this brief explanation of the delay in these proceedings in view of the statutory provision requiring speedy hearing. Considering the similarity of the claims of these plaintiffs, these cases were consolidated, for every purpose, with the Poling case as above styled although the claim of the plaintiff Poling has been dismissed.

The complaints charge that these actions were filed under Section 8(e) of the Selective Training and Service Act of 1940 (54 Stat. 890, 50 U.S.C.A.Appendix, Sec. 308(e)), as amended (56 Stat. 724), and Sec. 7(a) of the Service Extension Act of 1941, as amended (Act of August 18, 1941, c. 362, Sec. 2, 55 Stat. 626; 50 U.S.C.A.Appendix, Sec. 352). Sec. 2, 55 Stat. 626, authorizes the President to extend the periods of training and service, enlistment, etc., of any or all persons inducted for training and service under the Selective Training and Service Act. Sec. 7, 55 Stat. 627, is obviously incorrectly cited as Sec. 7(a). Sec. 7, 55 Stat. 627, preserves and extends re-employment benefits provided in Sec. 8 of the Selective Training and Service Act of 1940 for those entering upon active military or naval service subsequent to May 1, 1940. Certain pertinent sections of the Act provide, in whole or in part, as follows:

"Sec. 8(a). Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under section 3(b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained. In addition, each such person who is inducted into the land or naval forces under this Act for training and service shall be given a physical examination at the beginning of such training and service; and upon the completion of his period of training and service under section 3(b), each such person shall be given another physical examination and, upon the written request of the person concerned, shall be given a statement of medical record by the

War Department: Provided, That such statement shall not contain any reference to mental or other conditions which in the judgment of the Secretary of War or the Secretary of the Navy would prove injurious to the physical or mental health of the person to whom it pertains."

"Sec. 8(b). In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from such training and service * * *

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so."

"Sec. 8(c). Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration."

"Sec. 8(e). In case any private employer fails or refuses to comply with the provisions of subsection (b) or subsection (c), the dis-trict court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require such employer to comply with such provisions, and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. The court shall order a speedy hearing in any such case and shall advance it on the calendar."

Of the present remaining plaintiffs, James Thomas Turner, Ralph E. Bunner and Junior R. McWilliams entered the employ of the defendant railroad (hereinafter referred to as "B & O"), as laborers at Grafton, West Virginia, on June 20, 1942, September 12, 1942, and September 12, 1942, respectively, and Jack McLaughlin entered the employ of the B & O as a laborer at Gassaway, West Virginia, on March 6, 1943. Grafton and Gassaway are different seniority points within the same division (Monongah) but were under the authority of the division officials stationed at Grafton. These four named plaintiffs left the employ of the B & O to perform training and service in the armed forces of the United States on November 28, 1942, October 13, 1942, May 18, 1943, and July 15, 1943, respectively.

At the time of entrance into the armed forces, each plaintiff held seniority in the laborers' (firemen and oilers) classification as follows: Turner, "Class C" seniority from June 20, 1942; Bunner, "Class C" seniority from September 12, 1942; McWilliams, "Class C" seniority from September 12, 1942, and "Class B" seniority from October 18, 1942; and McLaughlin, "Class C" seniority from March 6, 1943, and "Class B" seniority from March 7, 1943. Each plaintiff satisfactorily completed a period of training and service in the armed forces, made timely application for reinstatement and otherwise qualified for the

benefits afforded by the Selective Training and Service Act of 1940, as amended.

Turner was reinstated on November 16, 1945, as a laborer, was promoted to machinist helper on December 10, 1945, and accorded seniority as such as of January 4, 1943. Bunner was reinstated on January 31, 1946, classified as machinist helper, with seniority as such as of January 4, 1943. McWilliams was reinstated on February 18, 1946, classified as a carman helper, with seniority as of June 14, 1943. McLaughlin was reinstated on February 12, 1946, classified as a laborer, was promoted to a position as sheet metal worker helper on July 8, 1946, and was given seniority as such as of June 30, 1944.

While the plaintiffs Turner and Bunner were absent due to military service, one B & O employee, J. W. Bradley, who had a laborer's seniority date of September 17, 1942, was promoted to machinist helper on January 4, 1943, with seniority as of the date of such promotion. The machinist helper seniority date, initially accorded to the plaintiffs, Turner and Bunner, after their reinstatement, was the date on which Bradley, the next junior laborer, was promoted to such position during their military leave of absence.

While the plaintiff McWilliams was in the armed forces, a B & O employee, E. A. Sherman, who had a laborer's seniority date of May 14, 1943, was promoted to a machinist helper on June 14, 1943, with seniority as of such date, and the helper seniority date initially accorded to McWilliams following his reinstatement was the date on which Sherman, the next junior laborer, was promoted to such position during McWilliams' military leave of absence.

While the plaintiff McLaughlin was absent due to military service, a B & O employee, G. B. Hurst, whose laborer's seniority date was April 3, 1944, was promoted to sheet metal worker helper on July 1, 1944, with seniority as of the date of promotion. The seniority initially accorded McLaughlin as sheet metal worker helper upon his reinstatement was the date immediately prior to the date on which Hurst, the next junior laborer, was promoted to such position during McLaughlin's military leave of absence.

In 1948, the seniority dates were revised by the B & O and these plaintiffs were given seniority dates as of the time of their promotions to helper positions and classifications. Under the applicable collective bargaining agreements, seniority in a position was to commence with the first assignment to such position. It is admitted that these plaintiffs were given a seniority date antedating their actual promotions, and representatives of the B & O, in attempting to apply the provisions of the Selective Training and Service Act then in effect, proceeded upon the theory that if these plaintiffs had not been in the military service, they would have been promoted on the earlier dates.

It is this 1948 downward revision of the seniority of these plaintiffs which is the basis of the present controversy. As a result of such revision, Turner, who had a relative standing of No. 69 on the January 1, 1947, machinist helpers' roster of 132, was given a seniority date of December 10, 1945, and a relative standing of No. 112 out of 121 on the roster of January 1, 1948. Bunner, who was No. 70 on the machinist helpers' roster of January 1, 1947, was given a seniority date of January 31, 1946, and became No. 113 on the roster of January 1, 1948. McWilliams, who was No. 78 on the machinist helpers' seniority roster of January 1, 1947, was accorded a seniority date of May 23, 1946, and became No. 116 on the roster of January 1, 1948. McLaughlin, who was No. 6 on the sheet metal worker helpers' seniority roster, was accorded a seniority date of July 8, 1946, and was No. 8 and last on the roster of January 1, 1948.

The 1948 revision of plaintiffs' seniority was occasioned by Award No. 1187, May, 1947, of the National Railroad Adjustment Board, Second Division (Indiana), which Award is sometimes referred to as the Bruce Pride case. There Acel

Jones and Bruce Pride were employed as laborers by the B & O, Jones having slightly more seniority. Jones went into military service, Pride staying behind, and, during Jones' absence, Pride was promoted to helper. When Jones returned, he was promoted to helper and given a retroactive seniority date immediately ahead of Pride, it being the belief of the B & O that, if Jones had not entered military service, he would have been promoted just before Pride due to Jones' greater seniority as laborer. This caused Pride to be furloughed, thus losing time and wages. Pride then brought the case before the NRAB for determination. Before the Board, the B & O argued just as the plaintiffs argue here. The Board decided that there was no obligation or duty on the B & O to promote laborers to other jobs and classifications on the basis of seniority, even though that was apparently the general practice; that when Jones was promoted, he had no right to a seniority date as helper superior to Pride's, when Pride had been first promoted. Pursuant to the Board's order, the B & O assigned to Jones a seniority date as of his actual promotion to helper.

The defendants here contend: That the Board's findings in Award No. 1187 are conclusive of the rights of these plaintiffs; that the Award is, at least, equivalent to expert testimony having great persuasive weight, since the same collective bargaining agreements and "Memoranda of Agreements" as here were involved in the Bruce Pride case; and that the Board is composed of experts in the field of interpreting such agreements. These contentions are, in the opinion of this Court, without merit. The plaintiffs were not parties to proceedings before the Board in Award No. 1187 and were not represented by a duly authorized agent. It is clear that such Award, even under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., would not be binding upon them for, as stated in Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 738, 65 S.Ct. 1282, 1297, 89 L.Ed. 1886, "For an award to affect the employee's rights, therefore, more must be shown than that the collective agent appeared and purported to act for him. It must appear that in some legally sufficient way he authorized it to act in his behalf." It is for the courts to determine the meaning of the re-employment statutes and the rights of veterans thereunder under applicable bargaining agreements without regard to whether these agreements are with railroads or other industries. The re-employment statutes are specific statutes for settlement of veterans' claims and prevail over the more general provisions of the Railway Labor Act. McKinney v. Missouri-Kansas-Texas Railroad, 10 Cir., 1956, 240 F. 2d 8, certiorari granted on other grounds 1957, 353 U.S. 948, 77 S.Ct. 860, 1 L.Ed. 2d 858; Moe v. Eastern Airlines, Inc., 5 Cir., 1957, 246 F.2d 215, and authorities cited therein. In addition, the custom and practice as to promotions, if considered in the contract interpretation in the Bruce Pride case, concerned the B & O shops at Washington, Indiana, not at Grafton and Gassaway, West Virginia. The Selective Training and Service Act expressly conferred jurisdiction over these disputes upon the district courts.

The plaintiffs say that it is not their contention that they were entitled to promotion to the first vacancies that occurred subsequent to their departure for military service, but only that they were entitled to promotion ahead of junior laborers who were promoted during their absence. ("It is the promotion of junior laborers that fixes and determines their rights." Plaintiffs' brief, page 2.)

Laborers, including plaintiffs when they entered military service, were subject to the provisions of the "Firemen and Oilers' Agreement". Rule 21 of the Firemen and Oilers' Agreement is the only rule of the agreement bearing upon the subject of promotions. It provides:

"Promotion and transfer of employees to new positions or to fill vacancies shall be based on ability, merit and seniority. Ability and merit being *sufficient*, seniority

shall prevail; the Management to be the judge. Seniority as per Rule 17, Article 4, to govern." (Emphasis added.)

A Memorandum of Agreement, dated October 28, 1941, was adopted by the B & O and the union which contained the two quoted paragraphs as follows:

"2. In the event it is desired to transfer employees coming within the scope of the Firemen and Oilers' Agreement to positions as helpers in the Maintenance of Equipment Department because of a shortage of qualified helpers in that department, such employees will retain an accumulated seniority on the Firemen and Oilers' seniority roster while so engaged as helpers or in other positions in the Maintenance of Equipment Department.

"3. When employees coming within the scope of the Firemen and Oilers' Agreement are selected for promotion to positions of helpers, they will be selected by the Local Management and the Local Committee, senior qualified Firemen and Oilers will be selected. Questions arising in connection with the qualification of any Fireman and Oiler for promotion may be handled in accordance with the provisions of the Firemen and Oilers' Agreement."

When this Memorandum of Agreement was circulated, there was attached to it an explanatory letter from the B & O which contained the following:

"Your particular attention is called to Paragraph numbered 2. It should be understood that it is not mandatory to promote Firemen and Oiler employees to helpers or other positions that may become vacant. Consideration should be given to the promotion of Firemen and Oiler employees, but promotions should not be effected where operating conditions would be disrupted.

"With reference to Paragraph numbered 3. Should it be decided to promote Firemen and Oiler em-

ployees, the matter should be handled jointly between the Local Management and Local Committee, based on Rule No. 21 of the Firemen and Oilers' Agreement, * * *."

This accompanying explanatory letter was distributed to representatives of the B & O and of System Federation No. 30.

The portion of the Firemen and Oilers' Agreement which establishes rules and working conditions for the laborers contains the following provision with reference to seniority in Rule 15 as follows: "Seniority begins at the time the employee's pay starts."

The pertinent rule in the Shop Crafts Agreement governing the commencement of seniority as a machinist helper is Rule 49, which reads:

"Employees regularly assigned to helping mechanics of the various crafts will be classified and hold seniority as helpers of the craft to which assigned * * *."

The Court's attention was directed to another Memorandum of Understanding between the B & O and the union, dated November 1, 1942, which provided that an employee in the military service "* * * shall, upon completion of such service in the land or naval forces, be restored to such position with this Company (including rights to promotion) to which his accumulated seniority entitles him, all in accordance with the then existing rules of the schedule agreement, the same as if he had remained in the service [of the Company]." This memorandum would not appear to be in point as to the present dispute, for the very question here is whether the plaintiffs had *rights* to promotion.

The plaintiffs appear to rely primarily on the Memorandum of Agreement of October 28, 1941, supra, which said, "when employees * * * are selected for promotion * * *." Webster's New International Dictionary gives these definitions:

"Select. (1) To take by preference from among others; to pick out; to cull."

"Selected. (1) Chosen from a number."

Webster's New World Dictionary, 1955, gives this definition:

"Select. (1) To choose or pick out from among others, as for excellence, desirability, etc."

Thus, the use of the verb "selected" denotes an exercise of judgment or discretion by the officials in charge of determining promotions. If the parties had contemplated the creation of an absolute right to promotion, or even a qualified right, surely more appropriate language, excluding the element of arbitrariness, would have been adopted. A careful examination of the pertinent contractual provisions fails to disclose any provision for an absolute right to the promotion of a laborer to a position in another craft.

■ But the plaintiffs contend that these contractual provisions should be construed in the light of the custom or practice which was followed by the B & O in advancing laborers to positions of helpers in other crafts, asserting that it was the usual custom and practice to make such promotions on the basis of seniority. It is possible that a custom or practice of promoting the senior qualified laborer could be so uniform as to become a part of the employment contract. A custom or usage cannot vary a contract when such usage is specifically at variance with the terms thereof. Hall v. Philadelphia Co., 1913, 72 W.Va. 573, 78 S.E. 755; Dant & Russell v. Grays Harbor Exp. Co., 9 Cir., 1939, 106 F.2d 911, 125 A.L.R. 1302; C. C. Mengel & Bro. v. Handy Choc. Co., 1 Cir., 1926, 10 F.2d 293. But a custom or usage may add other terms to the contract not inconsistent with it. A. L. I., Restatement Contracts, Section 246. In the instant cases, it would appear that the alleged custom and practice would merely implement the original contract, not vary it, and evidence material to that point should be admitted. McClellan v. Pennsylvania R. Co., 2 Cir., 1932, 62 F.2d 61; 25 C.J.S. Customs & Usages § 34.

■ What constitutes a custom or usage in the legal sense does not necessarily coincide with the layman's definition of "the custom" or "the ordinary practice". See Sickelco v. Union Pac. R., 9 Cir., 1940, 111 F.2d 746; In re Bowling Green Milling Co., 6 Cir., 1942, 132 F.2d 279. The case of Shipley v. Pittsburgh & L. E. R. R. Co., D.C.W.D.Pa. 1949, 83 F.Supp. 722, 749 aptly summarizes the law in this field:

"To establish a custom it is not enough to prove the act is frequently done; it must be both alleged and proved to be certain, general, uniform and recognized, and so notorious as to be probably known to all parties to be controlled by it. Where it is so alleged and proved, it is a fair presumption that the parties, on entering into their engagement, do it with reference to the custom, and agree that their rights and responsibilities shall be determined by it. A practice to arise to the dignity of a custom so as to enter into and form a part of a contract must possess those elements of certainty, generality, fixedness, and uniformity, as are recognized by the law as essential to constitute a custom. A loose, variable custom or discretionary practice does not arise to the dignity of a custom so as to control the rights of the parties to a contract. If the usage leaves some material element to the right of exercising an option, or discretion, of one of the parties, it does not constitute a custom. * * * One who would establish a custom or usage has the burden of proving it by evidence so clear, uncontradictory and distinct as to leave no doubt as to its nature and character."

To prove the alleged custom and practice of promoting the senior qualified laborer, the plaintiffs called witnesses Earl Stimson and George M. Hussion. Stimson worked for the B & O at Grafton as Master Mechanic from April 16, 1943, until May 1, 1955. Hussion has

been General Foreman for the B & O at Grafton since 1937.

Part of Stimson's duties at Grafton involved the handling of promotions, in accordance with directives and memorandum agreements issued by the B & O and the union, and in cooperation with a committee representing the local unions. He testified that when a vacancy occurred in a helper position, he or the General Foreman would contact the General Chairman of the Firemen and Oilers and "endeavor to give these positions to the oldest man *available* if he wanted it." (Tr. 33; emphasis supplied.) According to his testimony, to be "qualified" meant that the laborer should be of average intelligence and ability and able to read and write, but no tests were given to determine qualifications. Stimson asserted that he interpreted the Memorandum of Agreement of October 28, 1941, as meaning that *the* senior qualified laborer should be promoted, when it was decided to promote a laborer instead of hiring someone from outside. He testified further: "At that time, if the man was not working, we didn't consider it, no, sir." (Tr. 45.) On cross-examination, Stimson was questioned concerning Defendants' Amended Exhibit "A" attached to Defendants' Requests for Admissions. This exhibit purported to be a list of employees holding seniority rights on the machinist helpers' roster at Grafton, and the sheet metal worker helpers' roster at Gassaway on the January 1, 1951, roster, and laborer or firemen and oilers seniority dates which those helpers then or at any time possessed as at the time the exhibit was prepared. This exhibit was later admitted into evidence for reasons hereinafter stated.

According to Exhibit "A", several junior laborers had been promoted to helpers ahead of senior laborers who were later promoted to helpers. Stimson's only recollection concerned No. 75, M. W. Boylan, who did not work as a laborer at Grafton but who transferred from Fairmont. When asked whether an exceptionally well qualified fireman and oiler might have been promoted ahead of the senior man, Stimson said that he could not recall such a situation but would not deny that it might have happened. The witness could not recall whether any of the firemen and oilers who were never promoted to helpers had ever been offered a promotion, nor could he explain why, of the fourteen men promoted to helper in 1945, only nine had previously worked as laborers.

The Court will attempt to briefly summarize the purport of the testimony of witness Stimson. He apparently clearly stated that a veteran or non-veteran would have to be present to be considered for promotion. In other words, the veterans, while absent in military service, were not considered for such promotions, and neither were other laborers who were absent on furlough or leave of absence. Although this witness attempted to testify generally as to the custom and practice, he could remember nothing about certain promotions called to his attention. (Tr. 55–60.) He acknowledged that there was no obligation to take the senior laborer if, in so doing, the service would be hurt (Tr. 66), and on cross-examination he admitted that he had previously testified under oath that: "The laborer to which the vacancy would be offered would depend, first, on his ability; second, on his merit and, third, on his seniority as a fireman and oiler * * *" (Tr. 79). He also admitted that he had previously testified that junior laborers had been promoted to helpers' positions on the basis of merit and ability, and that he had said, concerning the practice under the agreement: "Yes, the merit and ability part of it came first" (Tr. 80–81). He acknowledged that the seniority roster shows that senior laborers were not, as a matter of fact, promoted first (Tr. 56, 57, 82–84), and he could not explain why (Tr. 84). He could not remember a single instance in which a senior man had refused promotion (Tr. 85–86), even with the roster before him to refresh his memory (Tr. 83–84). In the face of his testimony that senior laborers were promoted, he admitted that the seniority

rosters showed the contrary. He simply surmised that perhaps the senior laborers who had been passed had refused promotion, but neither he nor Hussion could recall a single specific instance in which a laborer had been offered a promotion to helper and had refused the promotion. His statement was a statement of his conclusions, which he was unable to support with a single name or single item of specific factual information, admitting at the same time that the factual information disclosed by the seniority rosters directly contradicted his conclusions.

The plaintiffs objected to the introduction into evidence of the aforementioned Exhibit "A" as being hearsay and not the best evidence of the matters contained therein. The defendants attached an original Exhibit "A" to their Requests for Admissions, asking the plaintiffs to admit the correctness and authenticity of the compilation. The plaintiffs did so admit, but upon information subsequently acquired, moved to withdraw said admissions on the ground that Exhibit "A" was in error in several material respects. After hearing arguments on the motion, the Court ordered the defendants to file an amended Exhibit "A" and overruled the plaintiffs' objections thereto. Of course, since the exhibit was prepared for the purpose of this litigation, it is not an "entry made in the regular course of business" so as to come within the well-known exception to the hearsay rule. However, the defendants called two witnesses to corroborate the exhibit—Miss Viola Hickman, a general clerk in the Grafton offices of the B & O, and Blaine E. Euler, Chief of the Personnel Record Bureau of the B & O. Miss Hickman compared the exhibit with the seniority rosters at Grafton and found the two to be identical. Mr. Euler produced the original records of the employees covered in the exhibit, and his testimony coincides with the dates and other information shown by the amended Exhibit "A" with one minor exception. The plaintiffs did not

attempt to contradict this evidence. For these reasons, it is the Court's opinion that there is nothing improper in admitting the exhibit into evidence. It is merely a summary of the evidence, taken from the original sources.

The plaintiffs' witness, Hussion, testified that he knew the men better than Mr. Stimson (Tr. 102, 114) and that when a vacancy occurred, he would confer with the union committeeman and together they would select a man to refer to Mr. Stimson (Tr. 92), or, in Stimson's absence, he would assume full responsibility and act himself (Tr. 115). They looked for men who were intelligent, fit and steady (Tr. 92) and did not disturb certain key laborers (Tr. 93). They did not seek out the senior men but rather considered those who had asked for promotion even though they might be junior to other laborers on the roster (Tr. 105). Mr. Hussion even declined to say that the senior qualified laborer was offered promotion to helper "more often than not" (Tr. 94). He remembered a number of specific instances in which laborers who were not senior were promoted on the basis of merit and ability (Tr. 103, 104). In his opinion, merit and ability weighed heavier in the selection of helpers than did seniority (Tr. 109). It is to be emphasized that both Mr. Stimson and Mr. Hussion were called to testify on behalf of the plaintiffs.

Certain examples, not intended to be exhaustive as to the promotion of junior laborers to helpers, may be cited as follows:

At the time employee Ford was promoted, he was junior in seniority to six other laborers;

At the time employee Kincaid was promoted, he was junior in seniority to five other laborers;

At the time employee Lohr was promoted, he was junior in seniority to eight other laborers;

At the time employee Peters was promoted, he was junior in seniority to six other laborers;

At the time employee Snyder was promoted, he was junior in seniority to one other laborer;

At the time another employee by the name of Peters was promoted, he was junior in seniority to three other laborers;

At the time employee Lewis was promoted, he was junior in seniority to six other laborers;

At the time employee Carlyle was promoted, he was junior in seniority to five other laborers;

At the time employee H. A. Poling was promoted, he was junior in seniority to the plaintiff Turner and two other laborers; and in that connection, Turner's testimony shows that he had never refused promotion to helper (Tr. 157).

A reference to Euler's testimony and Exhibit "A" discloses that between November 1, 1941, and December 10, 1945, fifty-nine men were employed as machinist helpers. Of these, forty-six had previous service as laborers and thirteen were hired from outside sources. The exhibit and Euler's testimony differ slightly on E. Miller, No. 87, but not as to the date he first worked for the B & O. The Court is not convinced that any particular ratio or percentage should be controlling in ascertaining whether a custom or usage exists. These references merely illustrate what, in fact, was done at Grafton.

Again, reference is made to the testimony of the plaintiffs' witnesses Stimson and Hussion. They both testified that when the time came to consider advancing a laborer to a helper's job, they conferred with the union committeeman. So it must be presumed that the committeeman knew the accepted meaning of the contract and the custom and practice with reference to advancing laborers to helpers' positions. The committeeman was the one to whom an aggrieved employee would have gone had he been deprived of his seniority privileges (Tr. 108). W. R. Gerkin was the committeeman (Tr. 214), and the evidence shows that it was upon his recommendation,

with the concurrence of Hussion, that Gerkin's helper, Ford, was promoted out of turn.

■■ The burden of proving, by a preponderance of the evidence, the alleged established custom or practice is upon the plaintiffs. The Court believes that it can fairly be said that such testimony as offered on the part of the plaintiffs clearly fails to show, by a preponderance of the evidence, that there was any fixed or established custom or practice to promote senior laborers. In fact, the plaintiffs not only failed to prove such custom or practice by a preponderance of the evidence, but the preponderance of their own evidence clearly shows that there was no such fixed established custom or practice, a conclusion which is further supported and substantiated by the defendants' evidence.

After a careful consideration of all the evidence in the case, the Court believes that the alleged custom and practice of promoting laborers to helpers falls short of the certainty, uniformity and definiteness necessary to incorporate the custom and practice into the written contract between the B & O and the union. The practice seems to have been somewhat loose and variable, with an important factor in the promotions being left to the discretion of the officials in charge. It is true that the plaintiffs do not contend that the B & O was obligated to obtain all of its machinist helpers from the ranks of the laborers, but it is contended that when it was decided to promote a laborer to helper, *the* senior qualified man was *entitled* to promotion. The evidence does not support the contention.

■ Plaintiffs assert rights to promotion by the following reasoning: Before going into the military service, each of the plaintiffs had the qualifications for a certain position; after military discharge, each was promoted to that position; therefore, each was entitled to that position all along. This syllogism is an example of the reasoning known as *post hoc, ergo propter hoc* (after it, therefore due to it). It is the fallacy

of confusing consequence with sequence, and ignoring other factors necessarily inherent in the resulting event. Other elements might have prevented the promotions of these plaintiffs, and the Court is unable to accept their argument. It is the Court's opinion and finding that these plaintiffs do not have a contractual right, express or implied, which would entitle them to promotion from laborers to other and different crafts of machinist helpers or sheet metal worker helpers.

 Many cases were cited by each side as authority for the propositions being respectively urged but, since the recent decision of the Supreme Court in the McKinney case, it appears unnecessary to review them. It is incumbent upon this Court to follow the latest pronouncement of the highest court of the land.

The decision in the case of McKinney v. Missouri-Kansas-Texas Railroad, 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305, will be considered and applied. In that case, the question to be determined concerned the rights of a returning veteran to promotion under Section 9 of the Universal Military Training and Service Act. Therefore, it will be necessary to compare the pertinent provisions of that Act with the provisions of Section 8 of the Selective Training and Service Act of 1940, as amended, which were in effect at the time these plaintiffs returned from military service.

The amendments to the 1940 Act are now noted. In 1942, (56 Stat. 724) § 8(a) was amended with reference to furnishing medical statements to those who complete the training and service. In 1944, (58 Stat. 798) § 8(b) was amended to extend the time for making application for re-employment from forty to ninety days. In 1948, the 1940 Act was replaced and, except as stated below, the pertinent parts of Sec. 9 of the 1948 Act correspond to the pertinent parts of Sec. 8 of the 1940 Act, as amended. Throughout the 1948 Act, the term "armed forces" is used rather than "land or naval forces". In 1951, (65 Stat. 75)

the name of the 1948 Act was changed to "Universal Military Training and Service Act".

Sec. 9(a) of the 1948 Act, as originally enacted, was exactly the same as Sec. 8(a) of the 1940 Act, as amended. This section was amended in 1955, with which amendment we are not here concerned. Sec. 9(b) of the 1948 Act is the same as Sec. 8(b) of the 1940 Act, except that the time for application for re-employment is extended to ninety days after being released from hospitalization continuing after discharge for a period of not more than one year and except for certain changes concerning qualifications. 9(b) omits the provision that a man must be qualified to perform the duties of the position and contains (B) (i) and (ii), which, for the purposes here, may be disregarded.

Sec. 9(c) of the 1948 Act is exactly the same as Sec. 8(c) of the 1940 Act except that the following provision was added:

"Sec. 9(c) (2). It is hereby declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment."

Sec. 9(d) of the 1948 Act is the equivalent of Sec. 8(e) of the 1940 Act, with certain changes which need not be here considered.

Having reviewed the provisions of the Selective Training and Service Act of 1940, as amended, (affecting and determining the rights of the plaintiffs here) with the provisions of the Universal Military and Training Act of 1948, and its amendments, (affecting and determining the rights of the plaintiff in the McKinney case), the decision of the

Supreme Court in McKinney, supra, will be followed and applied.

In that case, the plaintiff claimed to have been deprived of seniority rights to which he was entitled under the statute and the collective bargaining agreement in force between his railroad employer and the union representing its employees. The Court said 357 U.S. at page 268, 78 S.Ct. at page 1225:

"The rights petitioner asserts are rights created by federal statute even though their determination may necessarily involve interpretation of a collective bargaining agreement. Although the statute does not itself create a seniority system, but accepts that set forth in the collective bargaining agreement, it requires the application of the principles of that system in a manner that will not deprive the veteran of the benefits, in terms of restoration to position and advancement in status, for which Congress has provided."

In interpreting the collective bargaining agreement, the Court held that the right to promotion was dependent not only on seniority, but on fitness and ability and the exercise of a discriminating managerial choice and said, 357 U.S. at page 272, 78 S.Ct. at page 1227:

"Petitioner was not entitled to a group 1 position simply because in his absence it had been bulletined, and if he had then been employed he might have applied for it, and respondent might have found that he possessed the requisite fitness and ability. The statute does not envisage overriding an employer's discretionary choice by any such mandatory promotion." (Emphasis supplied.)

It is interesting to note that the plaintiff in the McKinney case, upon his return from service, was first given a higher position in an employee group (1) with a seniority date prior to the date of his first assignment to the position, just as these plaintiffs in the instant cases, upon their return from service, were given advancements in positions and seniority dates prior to the dates of their first assignments to helper classifications. At page 273 of 357 U.S., at page 1227 of 78 S.Ct., the Court said:

"Respondent asserts that petitioner was in fact assigned to group 1 position of assistant cashier through a mistake of law. Whatever the reason, the fact of employment in the higher position did not enlarge petitioner's rights under either the collective bargaining agreement or the statute. Since respondent was not obligated to give petitioner the higher position at all, when it did so it was not bound to give him a seniority date earlier than that to which any employee similarly promoted would have been entitled. In this case that was the date on which petitioner's pay in the group 1 position commenced, and not a month earlier when the position had first been bulletined."

The Court, in McKinney, 357 U.S. at pages 270, 271 and 272, 78 S.Ct. at page 1226, in construing Section 9, had this to say:

"Section 9 of the Universal Military Training and Service Act, on which petitioner relies, requires that a returning veteran who has been separated from the service under the conditions set forth in the statute be restored by his employer to his former position or to a position of like seniority, status, and pay. He is not to be disadvantaged by serving his country. Section 9(c) (1) states that he shall be restored 'without loss of seniority.' In Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284–285 [66 S.Ct. 1105, 1110–1111, 90 L.Ed. 1230], and Oakley v. Louisville & N. R. Co., 338 U.S. 278, 283 [70 S.Ct. 119, 122, 94 L.Ed. 87] the same provision in an earlier Act was interpreted to mean that a returning veteran does not step back at the exact point he left his employment,

but rather is entitled to 'a position which, on the moving escalator of terms and conditions affecting that particular employment, would be comparable to the position which he would have held if he had remained continuously in his civilian employment.' 338 U.S. at page 283 [70 S.Ct. at page 122]. This interpretation is now embodied in § 9(c) (2) of the present Act.

"However, § 9(c) does not guarantee the returning serviceman a perfect reproduction of the civilian employment that *might* have been his if he had not been called to the colors. Much there is that *might* have flowed from experience, effort, or chance *to which he cannot lay claim under the statute.* Section 9(c) does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those *changes and advancements in status that would necessarily have occurred simply by virtue of continued employment* will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to give to the veteran a status that he could not have attained, *as of right, within the system of his employment,* even if he had not been inducted into the Armed Forces but continued in his civilian employment. (Emphasis supplied.)

"Thus, on application for re-employment a veteran is not entitled to demand that he be assigned a position higher than he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer."

These plaintiffs could not have demanded, upon return from military service, that they be promoted from their former positions as laborers in the firemen and oilers classification to higher positions as helpers. There was no obligation on their employer, the B & O, to so promote them. When they were advanced to helpers' positions, they were entitled, by the plain provisions of the collective bargaining agreement, to seniority in their new positions and crafts as of the date of such advancement, without regard to their acquired seniority in the lower firemen and oilers classification from which they were promoted. The applicable law does not require the employer, the B & O, to speculate as to the position and seniority date which each plaintiff *might* have obtained had he remained in his civilian employment. Accordingly, the relief sought by these plaintiffs must be denied. However, by virtue of the terms of the Selective Training and Service Act, no costs may be assessed against them.

In this written opinion, there appear numerous recitals of fact and certain conclusions of law. Some of the stated facts were stipulated by the parties; others were findings of fact based upon the evidence. It would appear unnecessary to repeat these facts and conclusions in separate findings and, therefore, the foregoing shall be considered as containing the Court's findings of fact and conclusions of law, although a brief statement of certain important facts and conclusions is to follow.

Counsel for the defendants are directed to forthwith prepare and submit an order in conformity with the views and conclusions herein expressed, with the provision that all briefs presented to the Court shall be filed herein and made a part of the record.

### Findings of Fact

1. A stipulation, identified as Plaintiffs' Exhibit No. 10, contains a statement of agreed facts, and the facts as therein stated are found as facts by the Court.

2. The defendant, Baltimore & Ohio Railroad, did not have an established and general and customary practice, at the time the plaintiffs went into military service or at the time of their return to

their employment, of affording laborers, or firemen and oilers, an opportunity to be promoted in the order of their seniority to helper classification in other crafts, such as machinist helper, carman helper, electrician helper, sheet metal worker helper, etc.

### Conclusions of Law

1. The laborers, or firemen and oilers, including these plaintiffs, employed by the defendant, Baltimore & Ohio Railroad, did not have a contractual right, either by written agreement or by established, general and customary practice, to an opportunity to be promoted in the order of their seniority from their classification as laborers to the classification of helpers in other crafts.

2. None of the plaintiffs is entitled to the seniority at first accorded him by the defendant, Baltimore & Ohio Railroad, upon his promotion to helper classification following his return from military service.

None of the plaintiffs is entitled to damages for loss of seniority by reason of the assignment of seniority by the defendant, Baltimore & Ohio Railroad, as of the date he actually commenced work in a helper classification.