960 F.2d 146
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Effie Mae JASEK, Representative of the Estate of Walter
Jasek, Plaintiff-Appellant,
v.
CSX TRANSPORTATION, INCORPORATED, Defendant-Appellee.
 No. 91-2707.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 4, 1992
Decided: April 15, 1992
 
 COUNSEL: Gerald Francis Gay, Baltimore, Maryland, for Appellant. Stephen Bennett Caplis, WHITEFORD, TAYLOR & PRESTON, Baltimore, Maryland, for Appellee. ON BRIEF: Herbert J. Arnold, Baltimore, Maryland, for Appellant. H. Russell Smouse, Whiteford, Taylor & Preston, Baltimore, Maryland, for Appellee.
 Before WILKINSON, Circuit Judge, WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 This action is brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 (FELA), and the Federal Boiler Inspection Act, 45 U.S.C. §§ 22-29, 31-34 (FBIA), by the widow and personal representative of the estate of Walter Jasek. The district court granted defendant's motion for summary judgment. Plaintiff appeals. We affirm.
 
 
 2
 This fatal accident occurred at 2:00 a.m., on March 21, 1989, in the Jessup Yard, a railroad switching yard of CSX on the outskirts of Baltimore. A CSX road train was moving railroad cars from Brunswick, Maryland, to Baltimore to be interrupted by a switching operation in the Jessup Yard. The crew of the road train consisted of Tanner (engineer), Pulley (brakeman), Turpin (flagman) and Boone (conductor).
 
 
 3
 Just prior to the arrival of the road train, a yard switcher had been engaged in routine switching operations within the Jessup Yard. The yard crew consisted of Jasek (engineer), Hunter (conductor), McGinnis (brakeman), and Childers (flagman).
 
 
 4
 In Jessup Yard track 10 runs alongside the yard office. Track 11 runs parallel to and is next adjacent to track 10. The plan for the switching work to be done by the road crew and its use of track 10 was well known and had been fully communicated to all members of the yard crew, including Jasek. The yard crew, including Jasek, was fully aware of the arrival of the road train into Jessup Yard and onto track 10. Following directions, the yard train pulled off of track 10 and onto track 11, to remain parked there until the road train operation had been completed. The members of the yard crew left their engine and went into the yard office for a break. Jasek, however, returned to the engine twice, and was walking around the front of his engine to the yard office when the accident occurred.
 
 
 5
 Moving down track 10 at four to five miles per hour approaching the yard office on its right and the stationary yard engine on track 11 on its left, the road train consisted of a lead boxcar followed by two engines and a third engine being operated by engineer Tanner. On the left side of the boxcar on its front left corner"stirrup" (ladder) rode brakeman Pulley, both hands on the ladder, facing the boxcar but looking to his left down the track ahead. He was carrying a lantern on his arm. The yard train was parked on track 11, across track 10 from the yard office. In the cab of the yard train were Jasek, the engineer, and Childers, the flagman. As the lead boxcar on the moving road train became nearly parallel with the yard engine, Jasek exited the cab of the yard engine via a door on its left side, went around the front of his engine onto track 10 and was hit by the left front corner of the lead boxcar moving along track 10. Jasek was run over and killed.
 
 
 6
 Before the court below, on the motion for summary judgment, were the depositions of every member of both train crews, seven in all. All of those depositions, apparently in toto, are included in the Appendix here on appeal. This is not the case of a partial or inadequate record. All of the witnesses have testified by deposition.
 
 
 7
 Plaintiff first sought recovery under the Boiler Inspection Act, 45 U.S.C. §§ 22-29, 31-34, alleging that two of the moving locomotives were not equipped with proper operating head lamps illuminating the track ahead. This claim has developed into a legal argument as to whether, under the applicable regulations, all three of the locomotives in the movement should have had illuminated head lamps focused ahead on the route of travel.
 
 
 8
 The undisputed evidence below was that the third engine in line, operated by engineer Tanner, was equipped with the required head lamp and it was illuminated. The two intervening engines between the boxcar and the operating engine did not have their head lamps illuminated. The court below read 49 C.F.R. § 229.125 as requiring the lead locomotive to have such illuminated head lamp. It found that the lead locomotive under the regulation was the operating locomotive occupied by engineer Tanner. It found that no such illuminated head lamps were required on the two non-operating engines between Tanner and the lead boxcar. Tiller v. Atlantic Coast Line R.R. Co., 323 U.S. 574 (1945), relied upon by plaintiff, is inapplicable. It would find negligence in the failure to have operating head lamps where required by regulation. Such is not the case here. We agree with the district court's finding that 49 C.F.R. § 229.125 did not require illuminated head lamps on the two non-operating engines and that there was no violation of the Boiler Inspection Act on the facts of this case.
 
 
 9
 Plaintiff also charged, as an FELA basis for recovery, that there was inadequate lighting in Jessup Yard and urges this claim as a jury issue. The court below found that there was no evidence offered which could support a finding by a reasonable jury of insufficient lighting as to tracks 10 and 11 at the location of this accident. On the contrary, the testimony was that the yard was well lit by yard tower lights and by lights on the yard office next to the scene; that the moving boxcar was seen by flagman Turpin who was 250 feet away; that engineer Tanner, from the locomotive, could see brakeman Pulley ahead on the boxcar about 150 feet away. We find that the district court's determination that there was no evidence of inadequate lighting to support a jury issue is correct.
 
 
 10
 The plaintiff's allegation that there was an FELA"inadequate warning" issue to be presented to the jury focused on the failure of the road engine to have been ringing its bell. It was agreed that Tanner was not ringing the bell at the time of the accident. It was also agreed before the court below, and here on appeal, that the rules for Jessup Yard do not require engines to constantly sound the bell in switching operations. Indeed the general rule is that "no warning of the movement of cars in switching is required." Sumney v. Southern Ry. Co., 89 F.2d 437, 440 (4th Cir. 1937). In the absence of a rule it was necessary for plaintiff, in order to sustain her position, to show that it was an established practice and custom in the yard to ring the bell during switching operations, or to show knowledge on the part of the engineer of the presence of people in the yard area who might be in danger.
 
 
 11
 There was no evidence that engineer Tanner, or for that matter anyone, knew of any person in danger. The only people in the area, including Jasek, were experienced trainmen who knew of the presence of the parked engine on track 11 and the approach of the road train on track 10. To prove a custom or practice to sound the continuous bell warning, it is necessary to show a definite uniform and observed practice under definite and uniform circumstances. McClellan v. Pennsylvania R.R. Co., 62 F.2d 61, 63 (2d Cir. 1932); Poling v. Baltimore & Ohio R.R. Co., 166 F. Supp. 710, 717 (N.D.W. Va. 1958). Here, four of the decedent's co-workers, engineer Tanner, flagman Turpin, brakeman McGinnis, and conductor Hunter, testified in their depositions that there was no custom in the Jessup Yard of ringing the bell in the circumstances here involved and it was not the usual practice. Hunter had been in the Jessup Yard continuously for at least five years preceding this accident. The only two witnesses suggesting anything to the contrary were Childers and Boone. Childers, a flagman, testified that the ringing of the bell was a "normal practice," but then countermanded that statement by saying that such ringing was a matter in the discretion of the engineer. Boone, a conductor, said that bell ringing was a usual practice, but added that there was no written rule requiring it and sometimes engineers did ring and sometimes they did not. This deposition testimony taken in a light most favorable to the plaintiff, is not sufficient to show to a "definite uniform and known practice," McClellan, 62 F.2d at 63. A rule requiring bell ringing when the engine "was about to move" is not pertinent here because the road train was already moving at four to five miles per hour and had been so moving for some time. Likewise there was no evidence that the road engineer, Tanner, knew, or had reason to know, that he was approaching anyone at or near the tracks. Tennant v. Peoria & Pekin Union Ry. Co., 321 U.S. 29 (1944), is not on point. In that case there was evidence of a rule requiring the bell to be rung "when an engine was about to move" and there was evidence of a custom of ringing the bell as the engine began to move. This is not the case here. The court below found that there was no rule and no practice or custom as shown by evidence of a definite uniform and observed practice and hence no duty to ring the bell. We agree.
 
 
 12
 While other FELA claims of negligence were painted with a broad brush, for example, the hiring of incompetent employees, the failure to station proper lookouts, and so forth, the court below found them subsumed in the inadequate lighting and failure to warn issues. Suffice it to say that he found no evidence to support such claims. We agree.
 
 
 13
 An attack mounted in appellate argument which does not appear to have been more than just nominally pressed by the plaintiff below, is that somehow it was a jury issue as to whether brakeman Pulley kept a proper lookout. We examine this argument.
 
 
 14
 Pulley says, and no one disputes it, that he was stationed on the left forward corner of the leading boxcar and was looking ahead when Jasek stepped out from Pulley's left from in front of the parked engine directly in the path of the moving boxcar; that Jasek was then two to five feet from Pulley; that Pulley yelled and gave an emergency stop signal. The physical facts bear all of this out. Childers, who was in the cab of Jasek's locomotive, testified that Jasek exited his locomotive cab on its left-hand side, slammed the door, and within only two to five seconds, Childers observed the boxcar passing along the right hand side of the parked yard engine and heard the commotion of the accident.
 
 
 15
 Plaintiff's urging to the district court and on appeal that Jasek being struck creates an inference that Pulley was not keeping a proper lookout simply is not warranted and does not create a jury issue. Here the only evidence was that Pulley was in position on the stirrup as the lead brakeman, was looking ahead, and that Jasek suddenly appeared from around the front of his locomotive only two to five feet from Pulley. No inference of an improper lookout could arise from the facts in this case.
 
 
 16
 Summary judgment for the defendant which was granted by the district court and which is before us on this appeal, was entirely proper. The record included the deposition of all witnesses, interrogatories and exhibits pertinent to this case, and showed that there was no genuine issue as to any material fact. Fed. R. Civ. P. 56.
 
 
 17
 The order of the district court granting summary judgment to CSX Transportation, Incorporated, is therefore
 
 
 18
 AFFIRMED.