Richard S. BOYNTON,
Plaintiff–Appellee,

v.

TRW, INC., Defendant–Appellant.

No. 83–1773.

United States Court of Appeals,
Sixth Circuit.

Reargued Nov. 12, 1986.
Decided Oct. 6, 1988.

Virginia F. Metz, argued, David B. Calzone, Butzel, Long, Gust, Klein, Van Zile, Detroit, Mich., for defendant-appellant.

Weinstein, Kroll, Gordon, Southfield, Mich., Richard F. Burns, argued, for plaintiff-appellee.

Beth M. Rivers, Donnelly, Huizenga, Wahl & Hagan, Detroit, Mich., for amicus curiae.

Before ENGEL, Chief Judge *,
LIVELY, KEITH, MERRITT,
KENNEDY, MARTIN, JONES,
KRUPANSKY, WELLFORD,
MILBURN, GUY, NELSON, RYAN,
BOGGS and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

This wrongful discharge diversity action raises a significant question concerning the scope of *Toussaint v. Blue Cross and Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980), a case in which Michigan's Supreme Court narrowed the traditional common law employment-at-will doctrine by holding "that an employer's expressed agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." *Toussaint,* 408 Mich. at 610, 292 N.W.2d 880. Richard Boynton, a former TRW salesman, was terminated by TRW in 1980 when his sales position was eliminated as a result of adverse economic conditions in the automobile industry. The specific issue raised by TRW in this appeal is whether the discharge of an employee retained under a "just cause employment contract," concededly motivated solely by an economically mandated reduction in force, is subject to judicial review under the just cause analysis of *Toussaint* and its progeny. We conclude that Michigan's courts have never held the *Toussaint* doctrine of just cause applicable to layoffs arising out of an eco-

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

nomically mandated reduction in force. Consequently, we hold that the district court erred in denying TRW's motion for a judgment notwithstanding the verdict.

We note at the outset that Boynton originally filed this action in district court in June of 1981. A jury trial was held and a judgment ultimately entered in favor of Boynton in September of 1983. TRW appealed and a divided panel of this court held "that the trial judge correctly submitted to the jury ... [the issue of] whether the economic conditions reflected in the evidence constituted 'just cause' for termination." *Boynton v. TRW, Inc.*, No. 83–1773, slip op. at 14 (January 17, 1986). However, the panel unanimously concluded that the district court erred in excluding evidence concerning Boynton's failure to mitigate his damages, and the case was remanded for new trial.

A majority of this court subsequently voted to vacate the initial panel's decision and to grant TRW's petition for a rehearing *en banc* because the case involved an issue of exceptional importance and first impression under Michigan law.[1] *See* Fed. R.App.P. 35. The court heard arguments in the case in November of 1986, but reserved its decision pending the Michigan Supreme Court's resolution on certification of a potentially dispositive issue in a related case still pending before this court, *Bankey v. Storer Broadcasting Co.*, No. 84–1296. Since the Michigan Court has yet to resolve the issue it accepted for certification in *Bankey*, this court feels it can no longer delay resolution of the issues raised in this case. Accordingly, we must comply with our duty to decide the case in light of the policies enunciated in the decisions of Michigan courts. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## I.

Plaintiff-appellee Richard Boynton enjoyed a long and varied career as a sales-man from 1945 until 1972. During this period, Boynton was employed by defendant-appellant TRW, Inc. on two separate occasions, the last extending from 1961 through 1969. In 1969, Boynton left TRW to work for Elastic Stop Nut. In September of 1972, Elastic Stop Nut reduced its sales force and Boynton was laid off. Boynton began work for a Dayton, Ohio company in October of 1972. Shortly thereafter, in November of 1972, Richard Bengston, a TRW sales manager, contacted Boynton to see if he was interested in returning to TRW. Bengston arranged to interview Boynton in Dayton for a position as a field representative in TRW's Chicago office. As the majority opinion by the panel which originally heard this case notes, the alleged representations made by Bengston to Boynton at the time of the 1972 interview, along with certain alleged termination practices and customs of TRW upon which Boynton claims to have relied during his ensuing employment with TRW, are the critical factual elements of this case. *See Boynton*, slip op. at 2–3.

Boynton testified that he accepted re-employment with TRW in reliance upon Bengston's statement that "he felt that if I [Boynton] did my usual job, that I would have a job until retirement." Boynton also claims to have relied upon Bengston's statement that "the philosophy of the company [TRW] had not changed" since Boynton last left TRW's employ in 1969. Boynton testified that it was his "understanding" that "the policy as far as I am concerned was that whoever had seniority was the last to be laid off."

After accepting a position with TRW, Boynton moved from Dayton to Chicago where he served from 1973 until 1977. In 1977, Boynton accepted a transfer to a sales position in TRW's Detroit office. In Detroit, Boynton's duties included soliciting sales from Chrysler, American Motors, and International Harvester. As the previous

---

**1.** In *Grubb v. W.A. Foote Memorial Hospital*, 741 F.2d 1486, 1499 (6th Cir.1984), *aff'g*, 533 F.Supp. 671 (E.D.Mich.1981), *vacated on reh'g on other grounds*, 759 F.2d 546 (6th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 209 (1985), a panel of this court affirmed the decision of a Michigan district court to refrain from hearing a claim similar to Boynton's as a pendent claim in an Age Discrimination in Employment Act case.

panel's majority opinion concluded, "Boynton performed in a very satisfactory manner, and at no time in this litigation did TRW challenge the quality of his performance." *Boynton,* slip op. at 3.

In 1980, TRW concluded that it was necessary to eliminate one of the four sales positions in its Detroit office due to adverse economic conditions in the automobile industry. On June 6, 1980, Boynton was laid off by TRW. Two of the three salesmen retained by TRW had less seniority than Boynton. TRW claimed that Boynton was selected for termination simply because Boynton's Chrysler and American Motors accounts were, relatively speaking, of the least importance to TRW. Richard Maloney, Boynton's supervisor, testified that in 1979 TRW had roughly an $11 million account with General Motors and a $10 million account with Ford, but only a $700,000 account with Chrysler and a $400,000 account with American Motors. Boynton personally testified that his gross sales had dropped from $2,300,000 in 1978 to "about $1,800,000" in 1979 and by "another 25%" in the first half of 1980. Boynton's position was not filled after his layoff.

In June of 1981, Boynton filed the present action claiming that Bengston's 1972 oral statements and TRW's pre–1979 unwritten policies created an implied employment contract under which Boynton could only be discharged for "just cause." Boynton further claimed that TRW's policies required it to base its decisions regarding layoffs solely upon seniority. As the previous panel's majority concluded, Boynton raised "no challenge as to the sincerity of TRW's motive in making this decision [the decision to lay off Boynton] and [made] no assertions that the reasons advanced by TRW in selecting him for termination were pretextual for any discriminatory intent, or in any way motivated by malice or bad faith."[2] *Boynton,* slip op. at 3. Rather, Boynton argued that "there was no necessity to lay anyone off," let alone a salesman with his seniority, and that the issue of whether the adverse eco-

nomic conditions alleged by TRW constituted "just cause" was an issue of fact for the jury.

TRW conceded that Bengston's November 1972 statements created an implied employment contract, but argued that the *Toussaint* doctrine of just cause was not applicable to discharges or layoffs resulting solely from adverse economic conditions. TRW also denied Boynton's claim that it was TRW's policy to lay off employees solely according to seniority. The district court denied TRW's motions for a directed verdict. The court submitted the issue of "whether economic conditions, under the circumstances in this case, was [*sic*] a good cause for discharging plaintiff" to the jury. The jury returned a verdict for Boynton in the amount of $143,000. This appeal followed.

## II.

Our initial inquiry concerns the applicability of the *Toussaint* doctrine of just cause terminations to layoffs motivated solely by a reduction in force resulting from adverse economic circumstances. In *Toussaint,* the Michigan Supreme Court limited the traditional common law view of oral employment contracts and employment contracts for an indefinite period or term. The traditional view held such contracts terminable at will. *See, e.g., Wiskotoni v. Michigan National Bank–West,* 716 F.2d 378, 384 (6th Cir.1983). *Toussaint* held "that an employer's expressed agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." *Toussaint,* 408 Mich. at 610, 292 N.W.2d 880. The Michigan court reasoned:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced.

---

**2.** In fact, Boynton abandoned age discrimination claims under both state and federal law before trial.

The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."

\* \* \* \* \* \*

If there is in effect a policy to dismiss for cause only, the employer may not depart from that policy at whim simply because he was under no obligation to institute the policy in the first place. Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory.

\* \* \* \* \* \*

We all agree that where an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review. The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work. A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge. There must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract.

\* \* \* \* \* \*

Where the employer alleges that the employee was discharged for one reason—excessive tardiness—and the employer presents evidence that he was really discharged for another reason—because he was making too much money in commissions—the question also is one of fact for the jury. The jury is always permitted to determine the employer's true reason for discharging the employee.

*Toussaint,* 408 Mich. at 613, 619, 621, 622, 292 N.W.2d 880 (footnotes omitted).

In the case at bar, there is no dispute that Boynton was led to believe that he could only be discharged for "just cause." Similarly, there is no dispute that the "true reason" Boynton was laid off by TRW was because of adverse economic circumstances. Under these facts, we must determine whether Boynton has stated a *Toussaint* claim. If Boynton has stated a claim, then under Michigan law, a trier of fact can "decide whether ... [a purely economic] reason for discharge amounts to good cause," *Toussaint,* 408 Mich. at 623, 292 N.W.2d 880, and, accordingly, can substitute its judgment for that of the employer.

■ The majority of the panel which originally heard TRW's appeal concluded that Michigan law recognized Boynton's claim:

Although the *Toussaint* court apparently had in mind primarily those cases in which misconduct of the employee was at issue, we see no basis for holding that its approach would be any different where the employer adduced another reason—such as the adverse economic conditions asserted here—as constituting just cause for termination under an implied contract of permanent employment.

*Boynton,* slip op. at 12. We find no support in Michigan law for the panel's broad reading of *Toussaint.* Accordingly, we hold that to the extent that Boynton seeks judicial review of the "justness" of his layoff, a layoff concededly motivated solely by adverse economic circumstances, he has failed to state a claim for relief.

Admittedly, several federal district courts and Michigan intermediate appellate court panels have read *Toussaint* to apply beyond the limits of the discharge context. *See, e.g., Ariganello v. Scott Paper Co.*, 588 F.Supp. 484, 486 (E.D.Mich.) ("[T]he tenor of *Toussaint* is that an employer can create various job-related expectations as a consequence of the assertions made by the employer to his employees."). Indeed, the *Toussaint* Court itself noted that:

> The right to continued employment absent cause for termination may, thus, because of stated employer policies and established procedures, be enforceable in contract *just as are rights so derived to bonuses, pensions and other forms of compensation* as previously held by Michigan courts.

*Toussaint*, 408 Mich. at 618–19, 292 N.W. 2d 880 (emphasis added). Several courts have interpreted the *Toussaint* doctrine of just cause to apply to claims based on employer-created expectations in severance pay (*Ariganello, supra* ); tenure review (*Marwil v. Baker*, 499 F.Supp. 560 (E.D. Mich.1980)); policies for employees returning from social service leave (*Sepanske v. Bendix Corp.*, 147 Mich.App. 819, 384 N.W.2d 54 (1985)); compensation based on sales commissions (*Bullock v. Auto Club of Michigan*, 146 Mich.App. 711, 381 N.W. 2d 793 (1985)); and discharge procedures (*Damrow v. Thumb Coop. Terminal, Inc.*, 126 Mich.App. 354, 337 N.W.2d 338 (1983)). Each of these cases recognized an employee's *Toussaint* contract claim where his employer had created an expectation contingent upon factors within either the employee's or the employer's control. We are, however, unable to agree with the panel's majority conclusion that a similarly broad reading of *Toussaint* supports an employee's wrongful discharge claim where the employee's position was eliminated solely because of adverse economic factors beyond his employer's control. Indeed, the *Toussaint* Court implicitly recognized that wrongful discharge claims must necessarily be predicated upon some concept of employee or employer "fault."

If the jury is permitted to decide whether there was good cause for discharge, there is the danger that it will substitute its judgment for the employer's. If the jurors would not have fired the employee *for doing what he admittedly did,* the employer may be held liable in damages although the employee was discharged in good faith and the employer's decision was not unreasonable.

*Toussaint*, 408 Mich. at 622, 292 N.W.2d 880. (emphasis added). A number of courts have come to a similar conclusion. *See, e.g., Bhogaonker v. Metro Hospital*, 164 Mich.App. 563, 417 N.W.2d 501 (1987) (per curiam), *appeal denied*, 429 Mich. 897 (1988); *Friske v. Jasinski Builders*, 156 Mich.App. 468, 402 N.W.2d 42 (1986), *appeal denied*, 428 Mich. 880 (1987); *Parker v. Diamond Crystal Salt Co.*, 683 F.Supp. 168 (W.D.Mich.1988).

In *Friske*, the plaintiff, David Friske, had worked for Jasinski Builders for twenty five years but was terminated when Jasinski's Board of Directors decided to discontinue the company's contracting operations and to terminate all employees connected with those operations. Friske's employment agreement provided for termination only "for sufficient cause as determined by [Jasinski's] Board of Directors...." *Friske*, 156 Mich.App. at 470, 402 N.W.2d 42. The trial court granted Jasinski's motion for summary judgment and the circuit court affirmed, concluding:

> [A]s a matter of law, ... the termination of plaintiff's employment which followed an economically motivated closing was "for sufficient cause" as provided in the agreement.

*Id.* at 471, 402 N.W.2d 42. The court of appeals, noting that *Friske* "does not claim fraud, bad faith or subterfuge on the part of the Board in its decision to cease its contracting operations[,]" *Id.* at 472, 402 N.W.2d 42, affirmed the circuit court's decision, holding:

> Case law indicates that termination of the employment of an otherwise competent employee due to an economically motivated business closing is not grounds for a wrongful discharge claim. *See, e.g., Bouwman v. Chrysler Corp.*, 114 Mich.App. 670, 681–682, 319 N.W.2d

621 (1982), *lv. den,* 417 Mich. 989 (1983); *Sahadi v. Reynolds Chemical,* 636 F.2d 1116, 1118 (CA 6, 1980); *F S Royster Guano Co. v. Hall,* 68 F.2d 533, 535 (CA 4, 1934). We find that these cases are analogous to the instant case and support a holding that, as a matter of law, plaintiff's discharge for economic reasons, as determined by and within the complete discretion of the board of directors of defendant corporation, constitutes termination for sufficient cause. To hold otherwise would impose an unworkable economic burden upon employers to stay in business to the point of bankruptcy in order to satisfy employment contracts and related agreements terminable only for good or sufficient cause.

The agreement herein empowered the board of directors to terminate plaintiff's employment for sufficient cause. The determination as to what constituted sufficient cause was left to the board's discretion. We find the agreement to be unambiguous in this regard and, therefore, must construe it according to its plain meaning. *Bank of the Commonwealth v. Criminal Justice Institute,* 102 Mich.App. 239, 244, 301 N.W.2d 486 (1980). No questions of fact exist with regard to the exercise of the board's discretion in terminating plaintiff's employment where economic reasons made it necessary. Consequently, we conclude that it would be impossible for plaintiff's claim to be supported at trial and, therefore, summary judgment was appropriate.

*Id.* at 472–73, 402 N.W.2d 42.

Similarly, in *Bhogaonker, supra,* Michigan's court of appeals affirmed a trial court's decision entering a judgment of no cause of action for the defendant employer in a wrongful discharge action predicated upon an economic reduction in force. Dr. Bhogaonker, a permanent employee of Metropolitan Hospital, was terminated because of economic conditions which resulted in staff reductions. Dr. Bhogaonker alleged that Metropolitan terminated his employment without cause in violation of its contractual obligations. The doctor did not, however, contest the economic necessity for his termination. *Bhogaonker,* 164 Mich.App. at 565, 417 N.W.2d 501. Citing *Friske,* the court held that Metropolitan was entitled to a judgment as a matter of law. *Id.*

■ Boynton's claim that he was discharged without cause is indistinguishable from the claims held barred in *Friske* and *Bhogaonker.* There is no dispute that TRW's decision to lay off Boynton was born out of economic necessity, a factor outside of Boynton's or TRW's control. Based on the Michigan cases previously cited, we are simply unable to conclude that Boynton's claim falls within the ambit of a *Toussaint* wrongful discharge claim. We find virtually no support for Boynton's claim that a "just cause employment contract" guarantees permanent employment regardless of changes in economic conditions, absent specific language to that effect. Further, while "[t]he jury is always permitted to determine the employer's true reason for discharging the employee[,]" *Toussaint,* 408 Mich. at 622, 292 N.W.2d 880, we find no support for the proposition that the soundness of a management decision to effect a reduction in force solely by reason of adverse economic circumstances is also subject to jury review. *See Friske,* 156 Mich.App. at 472–73, 402 N.W.2d 42; *Bhogaonker,* 164 Mich.App. at 565–66, 417 N.W.2d 501. Accordingly, we hold that to the extent Boynton's claim challenges the "justness" of TRW's economically motivated decision to eliminate his sales position, a position left unfilled, TRW is entitled to a judgment as a matter of law.

### III.

■ Our holding that Boynton is precluded from attacking the "justness" of TRW's decision to terminate his employment does not preclude Boynton from challenging the procedure followed by TRW in making its determination to discharge him rather than one of his three co-workers, two of whom had less seniority than Boynton. Boynton claims that TRW violated its policy of laying off employees solely on the

basis of seniority. To the extent that Boynton has proven the existence of such a policy, he has stated a *Toussaint* claim regardless of whether or not he relied upon the policy. *See Toussaint*, 408 Mich. at 613 n. 25, 292 N.W.2d 880; *Damrow*, 126 Mich.App. at 363–64, 337 N.W.2d 338.

At trial, TRW argued that Boynton had failed to produce any evidence indicating that TRW had followed a seniority-based layoff policy at any point during Boynton's tenure with the company. According to TRW, Boynton showed only that his own subjective understanding of the company's policy was that it was based upon seniority. Since "a mere subjective expectancy on the part of an employee ... [does] not create a legitimate [*Toussaint*] claim[,]" *Schwartz v. Michigan Sugar Co.*, 106 Mich.App. 471, 478, 308 N.W.2d 459 (1981), *appeal denied*, 414 Mich. 870 (1982) (citation omitted), TRW moved for a directed verdict both at the close of Boynton's case and after the jury announced its verdict. The district court denied both motions.

Boynton argues that TRW's technical noncompliance with Fed.R.Civ.P. 50 by failing to move for a directed verdict at the close of defendant's proofs and failing to characterize its post-verdict motion as one for a judgment notwithstanding the verdict constitutes a waiver of TRW's right to challenge the sufficiency of Boynton's proofs both at trial and on appeal. At the close of Boynton's case, the district court took TRW's motion for a directed verdict under advisement and expressed its intention to submit the case to the jury. Thereafter, TRW called but one witness, Grace Napolitan, TRW's former director of industrial relations, and rested its case without renewing its motion for a directed verdict. Napolitan's testimony lasted approximately one half hour and was basically repetitive of the prior testimony of Boynton's witnesses. After the jury returned its verdict in favor of Boynton, TRW moved to "renew our motion for a directed verdict." Finding that Boynton had presented sufficient evidence to create a jury question, the court denied TRW's motion.

"Rule 50(b) of the Federal Rules of Civil Procedure requires that a party move for a directed verdict at the close of all the evidence as a prerequisite to its motion for judgment n.o.v." *Roper, IBG v. Reisz*, 718 F.2d 1004, 1007 (11th Cir.1983) (citing Fed. R.Civ.P. 50(b) advisory committee note). "A motion for a directed verdict at the close of plaintiff's case will not suffice unless it is renewed at the close of all the evidence." *Id.* (citing *Special Promotions, Inc. v. Southwest Photos Ltd.*, 559 F.2d 430, 432 (5th Cir.1977)). *See also American National Bank & Trust Co. v. Dean*, 249 F.2d 82 (6th Cir.1957). "A litigant who has moved for a directed verdict at some point prior to the conclusion of trial, but failed to renew the motion at the close of all the evidence, is thus held to have waived the right to move for judgment *non obstante verdicto*." *Bohrer v. Hanes Corp.*, 715 F.2d 213, 216 (5th Cir. 1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984) (citations omitted).

Boynton argues that TRW's failure to renew its motion for a directed verdict at the close of its case precluded the district court, and consequently this court, from addressing TRW's claim that its post-verdict renewal of its motion for a directed verdict was the functional equivalent of a motion for a judgment notwithstanding the verdict. Boynton argues further that even if TRW's literal noncompliance with Rule 50(b) is excused, TRW's "renewed motion for a directed verdict" fails to qualify as a motion for a judgment n.o.v.

While some courts have strictly enforced Rule 50(b), "others have adopted a more flexible approach toward a party's noncompliance with its terms." *Bohrer*, 715 F.2d at 216 (citations omitted). While "[i]t is certainly the better and safer practice to renew the motion for directed verdict at the the close of all the evidence,"

[t]he application of Rule 50(b) in any case "should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for truth."

*Bonner v. Coughlin,* 657 F.2d 931, 939 (7th Cir.1981) (citations omitted). Commentators have also noted the judicial trend toward a flexible approach to Rule 50(b):

> [S]ome fairly recent cases have held that a motion for judgment notwithstanding may be granted despite the party's failure to renew his motion for a directed verdict where: (1) The court indicated that the renewal of the motion would not be necessary to preserve the party's rights; and (2) The evidence following the party's unrenewed motion for a directed verdict was brief and inconsequential.

5A *Moore's Federal Practice* § 50.08, at 50–90 (2d ed. 1984). *See also* 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2537, at 597–98 (1971).

■ Under the unique facts of this case, we are convinced that TRW's technical noncompliance with Rule 50(b) in failing to renew its directed verdict motion at the end of Napolitan's testimony did not bar the district court from considering TRW's postverdict motion to "renew our motion for a directed verdict" as a motion for a judgment n.o.v. The district court took TRW's motion for a directed verdict, made at the close of Boynton's case, under advisement and indicated its firm intent to "get the case to the jury." The evidence TRW introduced in its case-in-chief was brief and largely cumulative of the testimony previously elicited from Boynton's witnesses. Under the circumstances, we find that no logical purpose would be served by holding that the district court was precluded from entertaining TRW's motion for a judgment n.o.v. We agree with the Fifth Circuit's conclusion in *Bohrer* that,

> [t]o demand a slavish adherence to the procedural sequence and to require these defendants, in this case, to articulate the words of renewal once the motion had been taken under advisement, would be "to succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of our rules."

715 F.2d at 217 (quoting *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018, 1025 (5th Cir.1979)).

■ We are also unpersuaded by Boynton's argument that TRW's "renewed motion for a directed verdict," made immediately after the jury had rendered its verdict, is insufficient to qualify as a motion for judgment n.o.v. Boynton raised no objection to the admittedly imprecise phraseology of TRW's motion, but it is eminently clear from the context of the colloquy that Boynton and the court were fully aware of the purpose of TRW's motion and had Boynton objected, TRW would have cured the defect instantaneously. In general, "appellate courts will not consider a point not raised below when the alleged error could readily have been cured if a timely objection had been made." *Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 822 (2d Cir.1984).[3]

■ Before reviewing the trial court's rulings on TRW's motions challenging the sufficiency of Boynton's evidentiary proofs, we note that a federal court sitting in a diversity case must apply the forum state's standard for a directed verdict and a judgment notwithstanding the verdict since the federal rule governing both motions, Fed.R.Civ.P. 50(a), does not specify a standard. *Briney v. Sears, Roebuck & Co.,* 782 F.2d 585, 587 (6th Cir.1986). Under Michigan law, "[t]he standards of review for denials of motions for directed verdict and judgment notwithstanding the verdict are identical." *Bonelli v. Volkswagen of America, Inc.,* 166 Mich.App. 483, 514 n. 7, 421 N.W.2d 213 (1988) (citing *Matras v. Amoco Oil Co.,* 424 Mich. 675, 681–82, 385 N.W.2d 586 (1986)). Further, under Michigan law an appellate court reviewing a trial court's denial of a defendant's motion for a directed verdict or a judgment notwithstanding the verdict

> must view the testimony, and all legitimate inferences that may be drawn therefrom, in the light most favorable to the plaintiff and determine whether the

---

**3.** In *Ebker,* the Second Circuit held that the defendants' untimely motion to renew their motion for a directed verdict qualified as a motion for a judgment n.o.v. where the plaintiff offered no procedural objection and "plaintiff's counsel and the court were fully aware that defendants' counsel was asking, however inartistically, the court to enter judgment n.o.v." 739 F.2d at 823.

evidence is sufficient to establish a *prima facie* case. *Matras v. Amoco Oil Co.*, 424 Mich. 675, 681–82, 385 N.W.2d 586 (1986). If reasonable jurors could honestly have reached different conclusions, then the motions should have been denied and the case should have been decided by the jury, since no court has the authority under such a circumstance to substitute its judgment for that of the jury. *Id.; Dickerson v. Nichols*, 161 Mich.App. 103, 107, 409 N.W.2d 741 (1987).

*Bonelli*, 166 Mich.App. at 513–14, 421 N.W.2d 213 (footnote omitted). Accordingly, we must review the record to determine whether reasonable jurors could honestly have concluded that TRW established a policy of laying off employees based solely on seniority.

■ Under *Toussaint*, an employer's statement of policy "can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee," even though "no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring." *Toussaint*, 408 Mich. at 614–15, 292 N.W.2d 880. Further,

> an employer's conduct and other pertinent circumstances may establish an unwritten "common law" providing the equivalent of a just cause termination policy. Rules and understandings, promulgated and fostered by the employer, may justify a legitimate claim to continued employment.

*Schwartz*, 106 Mich.App. at 477, 388 N.W. 2d 459 (citation omitted). Nonetheless, the employer's purported policy must exist somewhere other than in the employee's own mind. "[A] plaintiff's subjective expectation does not create an enforceable contract right." *Sepanske*, 147 Mich.App. at 827, 384 N.W.2d 54 (citing *Schwartz*, 106 Mich.App. at 471, 388 N.W.2d 459). Based upon a careful review of the record, we conclude that Boynton has shown nothing more than that his own subjective expectation was that he would not be laid off because he had more seniority than two of his three co-workers.

■ All witnesses at trial agreed that prior to 1979, any such policy would have been unwritten. TRW first put its policies regarding layoffs in writing in 1979. According to Boynton, Bengston assured him at their 1972 meeting in Dayton that TRW's policies had not changed since Boynton last worked for TRW in 1969. Boynton testified as to his "understanding" of TRW's policy on layoffs: "[T]he policy as far as I am concerned was that whoever had seniority was the last to be laid off." The court asked Boynton, "You don't know of your knowledge what the policy was, do you?" Boynton answered, "Not exactly, no." Boynton stated that his understanding of TRW's policy was "based on forty years of experience and in discussing the matters with many people who were in top management positions[,]" including "management all the way up to the president." However, Boynton never identified the nature or context of his purported conversations with "top management," nor did he identify the specific individuals who purportedly told him that TRW adhered to a seniority-based layoff policy. As Judge Wellford's concurrence to the original panel's majority opinion notes, Boynton "conceded ... that only one of two layoffs in the Chicago office while he was working for TRW in the mid–70's was based on seniority. The other, laid off at the same time, was not based on seniority, but involved a 'personality problem.'" *Boynton*, slip op. at 20 n. 2.

Bengston testified that between 1972 and 1974, while serving as a sales manager for TRW, he laid off "approximately six or eight people." Bengston stated that he followed TRW's then unpublished policy in making his determination as to which employees to lay off and that to his knowledge TRW's unpublished policy did not differ from the policy TRW reduced to writing in its 1979 Employee Handbook. The handbook provides as follows:

> A layoff is an involuntary separation from the Company when poor economic conditions, general business or operating problems, reduced work activity, reorganization or restructuring require a reduction in the workforce.

\*　　\*　　\*　　\*　　\*　　\*

When management determines a layoff is necessary at one or more facilities, it will layoff [*sic*], transfer, and/or make reductions within facilities, job areas/departments, on the basis of skill, quality of past performance, and present ability to perform the required and available work. *All other factors being equal, seniority governs in determining employees to be laid off, transferred, or reduced from one classification to another.*

(Emphasis added.)

Richard Maloney, Boynton's supervisor and the employee who made the decision to lay off Boynton rather than one of his three co-workers, agreed with Bengston's testimony. Maloney testified that TRW's 1979 written policy was the "same policy" as the unwritten policy previously followed by TRW and the policy which guided his decision to lay off Boynton in June of 1980. Napolitan, TRW's former director of industrial relations and the author of TRW's 1979 Employee Handbook, testified that the handbook represented a codification of the general unwritten practices and procedures which TRW had previously followed.

In sum, TRW offered overwhelming evidence that its layoff policy was at all pertinent times based on a myriad of factors, the least important of which was seniority. Other than his own subjective belief that employees were laid off according to seniority, Boynton offered no evidence of a contrary policy. Boynton's failure to produce any significant evidence from which a reasonable jury could infer that TRW followed a seniority-based policy undermines the basis of his claim that TRW breached the discharge-related terms of his employment contract. Accordingly, we hold that the district court erred in denying TRW's motion for a directed verdict at the close of Boynton's case, or, alternatively, for a judgment notwithstanding the verdict.

IV.

Our disposition of this appeal obviates the need to address TRW's remaining assignments of error. For the reasons stated, we REVERSE the judgment of the district court and REMAND the case with instructions to dismiss Boynton's claim.

LIVELY, Circuit Judge concurring.

I concur in the result, since the en banc court agreed unanimously with the panel that the judgment should be reversed because of the district court's failure to submit to the jury the issue of mitigation of damages.

Nevertheless, I continue to feel that the en banc court should not issue a decision on the applicability of the *Toussaint* doctrine to the facts of this case, but should await clarification of that doctrine by the Michigan Supreme Court.

This is a diversity case that is controlled by Michigan law. The state courts of Michigan have issued countless opinions, often conflicting, on the application of *Toussaint* in various situations. This court's decision is not binding on any of the state courts, and we are building a separate body of *Toussaint* law in the federal courts of Michigan. I believe it is essential for the Michigan Supreme Court to clarify this body of law and that it is a poor use of limited resources for this court to deal with these issues in an en banc decision.