417 S.E.2d 910

Lowell R. ADKINS, Robert C. Browning, Johnny E. Damron, Carroll V. Edmonds, Dewey R. Johnson, James E. Lewis, and Leland E. Pottorff, Plaintiffs Below, Appellees,

v.

INCO ALLOYS INTERNATIONAL, INC., a Delaware Corporation, John H. Tunderman, Charles S. Ferguson, Thomas Donnally and Michael Knight, Defendants Below.

Inco Alloys International, Inc., Appellant.

No. 20218.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 1992.

Decided April 22, 1992.

Rehearing Denied June 24, 1992.

---

Joseph M. Farrell, Jr., James A. McKowen, Hunt & Wilson, Charleston, Charles M. Hatcher, Jr., Huntington, for appellees.

John E. Jenkins, Jr., Evan H. Jenkins, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for appellant.

MILLER, Justice:

This is an appeal by the defendant below, INCO Alloys International, Inc. (INCO), from a judgment, entered on March 5, 1991, by the Circuit Court of Cabell County, which affirmed a jury verdict in favor of the plaintiffs below, all former INCO employees, in an action for breach of their contracts of employment. The jury found that INCO had terminated the plaintiffs' employment in violation of implied contractual seniority rights. The principal issue on appeal is whether such rights can arise solely from the past practices of the em-

ployer. We conclude that under certain circumstances, such rights may arise, but did not in this case. We, therefore, reverse the judgment of the circuit court.

INCO operates a metallurgical plant in Huntington, Cabell County. The most senior of the plaintiffs, Lowell R. Adkins, began working for INCO in March of 1960. The most junior, Leland E. Pottorff, was hired in August of 1973. Almost all of the plaintiffs began work at INCO as hourly employees, or operators, who were members of a union and protected by a collective bargaining agreement. The plaintiffs were subsequently promoted to the inspection department. As inspectors, the plaintiffs occupied a management position not covered by the collective bargaining agreement and were transferred to the weekly salary payroll.

It appears from the record that prior to 1979 there was a seniority system with regard to movement within the inspection department. Seniority lists were kept, and written notices of job vacancies or openings were posted. Inspectors who were interested in moving to those positions "bid" on them by signing the notice sheet. The job would be awarded to the qualified inspector with the most seniority. If an inspector's job was eliminated, he could "bump" a less senior inspector and take the latter's job. This system of bidding and bumping was also used to choose vacation and workshifts and to distribute overtime. It does not appear, however, that any inspector had bidding or bumping rights outside the inspection department.

In 1979, INCO reorganized the inspection department, setting up three types of inspectors: Quality Control Specialists, which required specific knowledge of a particular product, Quality Assurance Specialists, which required broad product knowledge, and Quality Control Specialists—Nondestructive Testing, which required technical training and certification to perform testing required by the government and other customers. At the same time, all inspectors were transferred from the weekly salary payroll to the monthly salary payroll, from which most management employees were paid. The system of bidding and bumping for jobs and perquisites ceased.

The plaintiffs contend, however, that the inspectors retained an informal seniority system of sorts after the 1979 reorganization. At least some job openings were reported to a manpower coordinator, who would orally notify area supervisors, who, in turn, would notify the inspectors. Those interested in applying for the position would do so through their supervisors or by contacting the manpower coordinator. If all qualifications for the job were equal, the most senior inspector who applied would usually be awarded the job. It appears, however, that not all job openings were filled through this process and that at least some reshuffling of positions was done solely by management decision. Inspectors continued to earn overtime and, in at least some areas of the inspection department, continued to bid for shifts and other perquisites.

In 1987, because of declining profits, INCO commissioned two separate studies of its operation. One study noted a chronic economic decline and recommended that INCO reduce its fixed costs by reducing the number of employees. The other study recommended, among other things, streamlining the inspection function by teaching the operators to inspect their own materials and products. INCO undertook to implement these recommendations, and the resulting reorganization brought about the loss of approximately 200 jobs at the Huntington plant, including the elimination of fourteen inspector positions. Approximately 100 employees took advantage of voluntary retirement options INCO offered in an effort to reduce the number of layoffs.

In September 1987, the plaintiffs and seven other inspectors were advised that their positions were being eliminated as a result of the reorganization. These inspectors were told that INCO would try to find jobs for them elsewhere in the plant, and they were asked to train the operators to take over the responsibilities of the eliminated positions. However, INCO was able to find jobs for only two of the fourteen inspectors. A third was subsequently fired

for cause. In December of 1987, INCO discharged approximately 100 people, including the plaintiffs.

The plaintiffs subsequently filed suit against INCO in the Circuit Court of Cabell County, alleging that INCO had breached their employment contracts by firing them and retaining less senior personnel.[1] Trial commenced on November 7, 1990. On December 3, 1990, the jury found in favor of the plaintiffs, awarding them over $2.6 million in damages. INCO's motions for a new trial and for judgment notwithstanding the verdict were denied by order of the circuit court dated March 5, 1991. It is from this order that INCO now appeals.

It is undisputed that the plaintiffs had no written contract of employment. The plaintiffs' breach of contract claim is, instead, premised on their assertion that INCO's conduct and prior dealings with them gave rise to an implied contract of employment requiring INCO to use seniority in making all employment decisions. INCO insists that the plaintiffs were at-will employees and that there were no enforceable contractual limitations on its right to fire them.[2]

The plaintiffs rely, in part, on principles established in *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986). The plaintiff employee in *Cook* had no written contract of employment. The employer, however, had distributed to its employees a handbook or policy manual which set forth a supposedly complete list of the reasons for which an employee could be fired. The plaintiff, who had been fired for other reasons, alleged that the handbook gave rise to an implied employment contract which permitted her to be discharged only for the reasons stated. The employer asserted that the plaintiff was an at-will employee who could be fired for any reason or for no

reason at all. The circuit court entered a directed verdict in favor of the employer.

On appeal, we recognized, in Syllabus Point 2 of *Cook*, that an oral contract of employment for an indefinite period of time is presumed to give rise to an "at-will" employment relationship:

" 'When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract.' Syl. pt. 2, *Wright v. Standard Ultramarine & Color Co.*, 141 W.Va. 368, 90 S.E.2d 459 (1955)."

See *Harless v. First Nat'l Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978). We also recognized, however, that the presumption may be overcome by evidence of contractual provisions to the contrary. In Syllabus Point 3 of *Cook*, we stated:

"Contractual provisions relating to discharge or job security may alter the at will status of a particular employee."

See *Bell v. South Penn Natural Gas Co.*, 135 W.Va. 25, 62 S.E.2d 285 (1950).

We noted in *Cook* that in other jurisdictions, promises of job security in an employee handbook or policy manual had been held to be enforceable and sufficient to transform an at-will employment relationship into one in which the employee could be fired only for just or stated cause. See, e.g., *Leikvold v. Valley View Community Hosp.*, 141 Ariz. 544, 688 P.2d 170 (1984); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983); *Woolley v. Hoffmann–LaRoche, Inc.*, 99 N.J. 284, 491 A.2d 1257, *modified on other grounds*, 101 N.J. 10, 499 A.2d 515 (1985); *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982); *Thompson v. St.*

---

1. The plaintiffs also raised claims of age discrimination, ERISA violations, outrageous conduct, and implied covenant of good faith and fair dealing. Of these claims, only the age discrimination claim went to the jury, which rendered a verdict thereon in favor of INCO. We are, therefore, concerned here only with the breach of contract claim.

2. The plaintiffs' claim for breach of contract should be distinguished from claims for wrongful discharge which arise when an at-will employee is fired for reasons which contravene some substantial public policy. See, e.g., *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987); *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984); *Harless v. First Nat'l Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

*Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984). *See generally* Annot., 33 A.L.R.4th 120 (1984). We concluded that these holdings were consistent with our traditional principles of contract formation [3] and held in Syllabus Point 5 of *Cook:*

> "A promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable."

We also recognized, however, that the offer contained in the employee handbook or policy manual " 'must be definite in form and must be communicated to the offeree.' " 176 W.Va. at 374, 342 S.E.2d at 459, *quoting Pine River State Bank v. Mettille,* 333 N.W.2d at 626. In Syllabus Point 6 of *Cook,* we held:

> "An employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons."

We found that the handbook's list of specific grounds for termination of employment provided sufficient evidence of an implied promise to discharge employees only on the stated grounds to warrant submitting the case to the jury.

Subsequently, in *Suter v. Harsco Corp.,* 184 W.Va. 734, 403 S.E.2d 751 (1991), we recognized that an implied contract of employment must be clearly proved. We also established that an explicit statement in the employment application that employment was terminable at will by the employer effectively disclaimed any implied promises contained in the employee handbook. We have acknowledged the principles set forth in *Cook* in several other cases. *See Collins v. Elkay Min. Co.,* 179 W.Va. 549, 371 S.E.2d 46 (1988); *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986); *Gillespie v. Elkins S. Baptist Church,* 177 W.Va. 88, 350 S.E.2d 715 (1986).

The plaintiffs also rely on cases from other jurisdictions which have recognized a contract for permanent employment based on oral statements by the employer to the effect that employment would be secure so long as the employee worked diligently and did not violate any company policy. A number of jurisdictions hold that such promises limit the employer's right to fire the employee to those circumstances where there is "just cause" for such discharge.[4]

However, these cases rarely turn solely on the promise of continued employment made to the employee.[5] Instead, most

---

**3.** In *Cook,* 176 W.Va. at 373, 342 S.E.2d at 458–59, we stated:

> "The concept of unilateral contract, where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise, has also been recognized: 'That an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well established.' *First National Bank v. Marietta Manufacturing Co.,* 151 W.Va. 636, 641–42, 153 S.E.2d 172, 176 (1967).
>
> "Consideration is also an essential element of a contract....
>
> Consideration has been defined as 'some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another.' 17 Am.Jur.2d Contracts, Section 85. A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract. 17 Am. Jur.2d, Contracts, Section 96.

*First National Bank v. Marietta Manufacturing Co., supra,* 151 W.Va. at 642, 153 S.E.2d at 177." (Citations omitted).

**4.** *See, e.g., Eales v. Tanana Valley Medical–Surgical Group, Inc.,* 663 P.2d 958 (Alaska 1983); *Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981); *Coelho v. Posi–Seal Int'l, Inc.,* 208 Conn. 106, 544 A.2d 170 (1988); *Terrio v. Millinocket Community Hosp.,* 379 A.2d 135 (Me.1977); *Toussaint v. Blue Cross & Blue Shield, supra; Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 766 P.2d 280 (1988), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989).

**5.** Only two of the cases cited in note 4, *supra,* were not clearly based on factors other than oral statements by the employer. In *Eales v. Tanana Valley Medical–Surgical Group, Inc.,* the employer "conceded that Eales' contract was for employment until retirement." 663 P.2d at 959. In *Coelho v. Posi–Seal International, Inc.,* the court found an agreement that "as long as he

courts consider a variety of factors. In some, there is an employee manual, like that in *Cook,* or other written policy statement which clearly implies that the employee will not be discharged except for good cause. *See, e.g., Toussaint v. Blue Cross & Blue Shield, supra.* In other cases, there are a number of activities by the employer and the employee that point to an implied agreement even though no promise is expressed in a written personnel manual.

In *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), for example, the California Supreme Court found that the employee had signed a covenant not to compete and a disclosure and assignment of information agreement when first hired. He was given promotions over the next six and one-half years and received superior performance awards and bonuses along with salary increases. He also claimed his superiors made repeated oral assurances of job security and that the employer had written termination guidelines. Those factors were deemed sufficient to permit the jury to find an implied contract not to terminate except for good cause.

"In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' (*Pugh* [*v. See's Candies, Inc.,* 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917, 925–26 (1981) ]; see Note, *Implied Contract Rights to Job Security* (1974) 26 Stan. L.Rev. 335, 350–366 [reviewing factors courts have used in implied contract analyses].)" 47 Cal.3d at 680, 254 Cal. Rptr. at 225, 765 P.2d at 387.

The Oklahoma Supreme Court in *Hinson v. Cameron,* 742 P.2d 549, 554–55

(Okla.1987), gave this summary of considerations that might give rise to an implied contract of employment:

"Factors which have been isolated as critical to evaluate whether an implied contract right to job security exists are: (a) evidence of some 'separate consideration' beyond the employee's services to support the implied term, (b) longevity of employment, (c) employer handbooks and policy manuals, (d) detrimental reliance on oral assurances, pre-employment interviews, company policy and past practices and (e) promotions and commendations." (Footnote omitted).

Much the same analysis has been applied in other jurisdictions. *See, e.g., Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 766 P.2d 280 (1988), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989); *Roberts v. Atlantic Richfield Co.,* 88 Wash.2d 887, 568 P.2d 764 (1977).

Recently, we discussed the permanent employment contract concept in *Williamson v. Sharvest Management Co.,* 187 W.Va. 30, 415 S.E.2d 271 (1992), where we recognized that "lifetime employment contracts are extraordinary and that an offer for lifetime employment must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." 187 W.Va. at 33, 415 S.E.2d at 274. (Citations omitted). The plaintiff in *Williamson* had been offered the position of manager of a combination grocery store and gasoline station. The employer had handwritten on a piece of paper the amount of the plaintiff's base salary, the hours of the store's operation, the wages of several other employees, and the fact that health insurance, a profit-sharing plan, and a Christmas bonus would be provided. The paper was not signed or dated by either party, nor was any duration of employment stated. We found this evidence insufficient

performed his job properly, the plaintiff would not be terminated as a result of conflicts between Posi–Seal's quality control and manufacturing departments." 544 A.2d at 174. This

finding was based on oral promises made to the plaintiff employee on several occasions by the company president and seemed to be almost conceded at trial.

as a matter of law to support the plaintiff's claim of lifetime employment.[6]

■ It is clear from *Williamson* and *Cook* that where an employee seeks to establish a permanent employment contract or other substantial employment right, either through express promises by the employer or by implication from the employer's personnel manual, policies, or custom and practice, such claim must be established by clear and convincing evidence.

The plaintiffs here offer no evidence of an employee handbook, policy manual, or any other written statement of policy as the basis for their claim of an implied promise to conduct layoffs by seniority.[7] Nor are their claims predicated on promises of permanent employment. Rather, the plaintiffs contend that there was an implied seniority policy limiting INCO's right to fire them, which arose solely from INCO's past practices and prior conduct.

The few cases that we have found that have dealt solely with an implied seniority claim based on custom and practice are federal cases that rely on Michigan law, as illustrated by this statement in *Pachla v. Saunders System, Inc.*, 899 F.2d 496, 498 (6th Cir.1990): "In *Toussaint [v. Blue Cross & Blue Shield*, 408 Mich. at 610, 292 N.W.2d at 890], the court held that 'an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in con-

tract.'" *See also Boynton v. TRW, Inc.*, 858 F.2d 1178 (6th Cir.1988); *Nixon v. Celotex Corp.*, 693 F.Supp. 547 (W.D.Mich. 1988). In *Pachla*, the employee, who was in a supervisory position, claimed that the company had, in practice, applied its written seniority policy for hourly employees to layoffs of supervisory personnel. The court found undisputed evidence that seniority was not the only criteria for layoffs of supervisory employees:

> "[The] testimony established only that seniority was one factor in Saunders' layoff procedure. Indeed, Pachla concedes that seniority was the basis for layoffs at Saunders only 'if performance was equal.' ... Because Pachla has failed to show that Saunders had a layoff policy based solely on seniority, he cannot argue that Saunders violated its layoff procedure simply by retaining two less senior employees." 899 F.2d at 501.

In *Boynton v. TRW, Inc., supra*, the employee, who was let go because of a reduction in force for economic reasons, claimed he was led by management to believe there was a seniority-based layoff policy. In concluding that the employee had failed to establish the existence of such a policy, the court stated: "However, Boynton never identified the nature or context of his purported conversations with 'top management,' nor did he identify the specific individuals who purportedly told him that TRW adhered to a seniority-based layoff policy." 858 F.2d at 1187.

---

**6.** We also stated in note 4 of *Williamson* that:

"[E]ven if there is a showing of sufficient consideration for a lifetime employment contract, the employer does retain the right to terminate a contract for lifetime employment 'for cause.' Annot., 60 A.L.R.3d 226 § 2[a], at 236 (1974); *see also* 53 Am.Jur.2d *Master and Servant* §§ 49–59 (1970)." 187 W.Va. at 34, 415 S.E.2d at 275.

While an implied permanent employment claim is not at issue here, even where such a claim has been proven, courts have concluded that economic necessity constitutes "just cause" for dismissal and that the employer may, therefore, lay off "permanent" employees for bona fide economic reasons. *See, e.g., Boynton v. TRW, Inc.*, 858 F.2d 1178 (6th Cir.1988); *Sahadi v. Reynolds Chem.*, 636 F.2d 1116 (6th Cir.1980); *Coelho v. Posi–Seal Int'l, Inc., supra; Friske v. Jasinski Builders, Inc.*, 156 Mich.App. 468, 402

N.W.2d 42 (1987). Courts have also recognized that even where an implied employment contract is established, the employer may change or abolish it by specific notice to the employee. *See, e.g., Dell v. Montgomery Ward & Co.*, 811 F.2d 970 (6th Cir.1987); *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 473 N.W.2d 268 (1991); *In re Certified Question*, 432 Mich. 438, 443 N.W.2d 112 (1989).

**7.** In employee handbook cases that have addressed the issue, promises to abide by seniority or to make employment decisions in accordance with established procedures are enforceable to the same extent as promises to discharge only for cause or for specified reasons. *See, e.g., Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991). *See also Hepp v. Lockheed–California Co.*, 86 Cal.App.3d 714, 150 Cal.Rptr. 408 (1978).

Finally, in *Nixon v. Celotex Corp., supra,* the employee failed to prove that the company had a policy of following seniority on an economic layoff:

"Nixon has neither alleged in his complaint nor offered evidence that Celotex had either a verbal or written policy that, during adverse economic conditions, discharges would be made on the basis of seniority. In fact, Nixon admitted that the company had no such written or verbal policy and 'stayed away from those kinds of commitments.' At best, Nixon has established that he had a subjective expectation that discharges would be based on seniority. Such expectations on the part of Nixon do not create an enforceable contract right. *Schwartz v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981). *See also Kay v. United Technologies Corp.,* 757 F.2d 100 (6th Cir.1985)." 693 F.Supp. at 557.

The above-cited cases do not discuss any general rule as to the sufficiency of the evidence to establish a custom or practice which will give rise to an implied contract right. This issue was addressed in *Poling v. Baltimore & Ohio Railroad Co.,* 166 F.Supp. 710 (N.D.W.Va.1958), where the plaintiffs were seeking seniority based on their military service. Part of their argument rested on the claim that promotions were customarily based solely on seniority. The court found this not to be the case factually and explained the evidentiary basis of the doctrine of custom and usage:

"What constitutes a custom or usage in the legal sense does not necessarily coincide with the layman's definition of 'the custom' or 'the ordinary practice.' ... The case of *Shipley v. Pittsburgh & L.E.R.R. Co.,* D.C.W.D.Pa.1949, 83 F.Supp. 722, 749 aptly summarizes the law in this field:

'To establish a custom it is not enough to prove the act is frequently done; it must be both alleged and proved to be certain, general, uniform and recognized, and so notorious as to be probably known to all parties to be controlled by it. Where it is so alleged and proved, it is a fair presumption that the parties, on entering into their engagement, do it with reference to the custom, and agree that their rights and responsibilities shall be determined by it. A practice to arise to the dignity of a custom so as to enter into and form a part of a contract must possess those elements of certainty, generality, fixedness, and uniformity, as are recognized by the law as essential to constitute a custom. A loose, variable custom or discretionary practice does not arise to the dignity of a custom so as to control the rights of the parties to a contract. If the usage leaves some material element to the right of exercising an option, or discretion, of one of the parties, it does not constitute a custom. * * * One who would establish a custom or usage has the burden of proving it by evidence so clear, uncontradictory and distinct as to leave no doubt as to its nature and character.' "

166 F.Supp. at 717. (Citations omitted). *See also Sterling Organ Co. v. House,* 25 W.Va. 64 (1884).

The doctrine is most frequently used to supplement or explain the terms of a written contract, but it is generally recognized that it cannot be used to vary the explicit terms of a contract. We explained this concept in *Sterling Organ Co. v. House,* 25 W.Va. at 96, as follows:

"[A] usage to be admissible to explain the intent of parties in a contract must not only be so well settled, so uniformly acted upon and of such long continuance, as to raise a fair presumption, that it was known to both contracting parties, and that they contracted in reference to and in conformity with it, but it must not control the express intention of the parties nor the interpretation and effect, which result from an established rule of law applicable to it, nor be inconsistent with a rule of the common law on the same subject. And such usage of a trade, in order that it may be regarded as incorporated into a contract, must be certain, general, known, reasonable and not

repugnant to the contract nor to the rules of law." (Citations omitted).[8]

*See, e.g., Cotiga Dev. Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962); *West Virginia–Pittsburgh Coal Co. v. Strong* 129 W.Va. 832, 42 S.E.2d 46 (1947); *Hall v. Philadelphia Co.,* 72 W.Va. 573, 78 S.E. 755 (1913). *See generally* 21A Am.Jur.2d *Customs & Usages* §§ 5–11 (1981); 25 C.J.S. *Customs & Usages* §§ 2–13 (1966 & Supp.1991).

■ From the foregoing authorities, it can be seen that in order to establish an implied contract right by custom and usage or practice, it must be shown by clear and convincing evidence that the practice occurred a sufficient number of times to indicate a regular course of business and under conditions that were substantially the same as the circumstances in the case at issue. Such a showing is necessary to demonstrate the parties' implied knowledge of and reliance on the custom or practice, an essential element of such a contract.

■ In this case, the plaintiffs have failed to establish by clear and convincing evidence that INCO had, by custom and practice, established a policy with regard to economic layoffs that was based only on seniority. Although there was a considerable amount of testimony regarding the "bid and bump" practice at INCO with regard to job openings within the inspection department, there is no evidence, other than the plaintiffs' subjective interpretation of events, to suggest that the practice was employed during economic layoffs. The practice was altered after the 1979 reorganization of the inspection department, with some, but not all, of the job openings being handled through the manpower coordinator. In addition, it appears that selection of employees to fill vacancies within the inspection department was not based solely on seniority, but also on qualifications, particularly after the 1979 reorganization of the department. Again, it must be emphasized that there were no written documents from INCO that suggested a department layoff system based only on seniority.

The record reflects that only two economic layoffs had occurred before the 1987 layoffs which involved the plaintiffs. While the entire mechanism of these layoffs is not set out in the record, it does appear that seniority was not the sole criteria for determining which employees were retained. In 1971, 118 salaried employees, of whom nine were inspectors, were laid off. It appears that factors other than seniority, specifically performance, played a role in the decision to layoff those individuals. In 1982, the 100 least senior employees were placed in a pool. Those with special skills were retained, the others were laid off. This militates against the idea that seniority was the sole criterion for selecting those employees to be let go during economic layoffs.

In *Boynton v. TRW, Inc.,* 858 F.2d at 1188, where layoffs were based on other factors besides seniority, the federal appeals court concluded:

> "Other than his own subjective belief that employees were laid off according to seniority, Boynton offered no evidence of a contrary policy. Boynton's failure to produce any significant evidence from which a reasonable jury could infer that TRW followed a seniority-based policy undermines the basis of his claim that TRW breached the discharge-related terms of his employment contract."

We conclude that the evidence here is in the same category and, therefore, fails to show a practice and custom which gave rise to implied contractual seniority rights. While seniority may have been a material factor in filling vacancies in the inspection department, there was no evidence that

---

**8.** With the additional factors of knowledge and implied acceptance of the practice by the parties, the rule is not unlike the one we pronounced with regard to the admissibility of habit evidence in Syllabus Point 14 of *Rodgers v. Rodgers,* 184 W.Va. 82, 399 S.E.2d 664 (1990): "Under Rule 406 of the West Virginia Rules of Evidence, evidence of a person's habit must be shown to be a regularly repeated response to similar factual situations. The trustworthiness of habit evidence lies in its regularity, such that the act or response is shown to be almost semiautomatic." *See* 2 *Wigmore on Evidence* §§ 379, 381 (Chadbourn rev. 1979).

228

this practice had any application in cases of economic layoffs.[9]

Because of the plaintiffs' failure to establish the claimed seniority practice by clear and unequivocal evidence, we find that INCO was entitled to a directed verdict. We conclude, as we did in *Williamson v. Sharvest Management Co., supra,* that the trial court should have granted the employer's motion for a directed verdict under Syllabus Point 3 of *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964):

> "When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant."

*See also Troy Min. Corp. v. Itmann Coal Co.,* 176 W.Va. 599, 346 S.E.2d 749 (1986); *Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979).

For the foregoing reasons, we reverse the judgment of the Circuit Court of Cabell County.

Reversed.

---

**9.** The plaintiffs also rely on a statement made by the president of INCO at a meeting to explain the 1979 reorganization of the inspection department. A retired management official testified that he recalled questions from inspectors about retaining the bumping and bidding practice and overtime arrangement, to which the president reportedly replied, in effect, "Nothing has changed." They assert that this statement constitutes a promise from which a contract can be implied. Without deciding whether such oral promises may give rise to contractual rights, we note that the president's response can hardly be taken as a clear and unequivocal statement that in the event of an economic layoff, seniority would be the sole factor in determining who was laid off and who was retained, in the absence of any evidence of such a practice prior to 1979.